HARMON PAPER CO. v. KIMBERLY CLARK CO. (two cases).

(District Court, E. D. Wisconsin.   May 15, 1922.)

Nos. 1123, 1124.

1. Patents ⚖�ネ328—1,344,570, for wall paper and process of making it, held invalid for want of invention.

The Warren patent, No. 1,344,570, for method of making wall paper with cloud effect of visionary depth and the wall paper thereby produced, *held* invalid for want of invention, because the patentee merely applied well-known blending process to well-known oatmeal paper, and produced effect which had been produced by others.

2. Patents ⚖⟹35—Commercial success immaterial, when question of invention not in doubt.

That owner of patent covering wall paper and the process of making it has had great success in marketing such paper, and that it has supplanted in considerable measure the papers formerly manufactured by it, has no pertinency, when the question of invention is not in doubt.

3. Patents ⚖⟹328—1,344,603, for paper-making apparatus, held invalid for want of invention.

The Warren patent, No. 1,344,603, for a paper-making apparatus, *held* invalid for want of invention.

4. Patents ⚖⟹328—Design, No. 54,152, held invalid.

The Warren design patent, No. 54,152, covering a design for wall paper, *held* invalid, as not covering a true design.

5. Patents ⚖⟹28—Design patent on any wall paper having specified effect cannot be granted.

Design patent covering any wall paper having cloud effect of visionary depth, resulting from specified manufacturing process, and not limited to the drawing and sample accompanying the patent, cannot be granted.

6. Patents ⚖⟹28—Design must be susceptible of application.

A design patent, if valid, must be susceptible of application within the art.

In Equity.   Suits by the Harmon Paper Company against the Kimberly Clark Company.   Bill in each suit dismissed.

Pennie, Davis, Marvin & Edmonds, of New York City, and Ralph W. Brown, of Milwaukee, Wis., for plaintiff.

Fisher Towle, Clapp & Soans, of Chicago, Ill., for defendant.

GEIGER, District Judge.   These two suits, charge infringement of letters patent No. 1,344,570, June 22, 1920, covering "wall paper and method of making it"; patent No. 1,344,603, June 22, 1920, covering "paper-making apparatus"; and patent No. 54,152, November 4, 1919, covering "design for wall paper"—all issued to Warren.

[1] Upon the trial of the cases it was conceded that the first noted is the dominant patent, and it will be thus considered.   The invention relates "to methods of making wall paper with a *cloud effect of*

⚖⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*visionary depth,"* and it also relates to the wall paper produced by such method.. The specification continues:

"The invention is based on the discovery that a wall paper having a soft and pleasing decorative appearance, together with a texture and body making it well suited to the operation of hanging and to use as a wall covering, may be produced by flowing a thin cloudlike coating of a blending paper stock onto a paper base, the surface of which has been broken up or roughened visually by incorporating with the said surface, or with the paper base as a whole, small particles, as of wood flour, of a color contrasting with the paper base, and which interrupt the otherwise smooth light-reflecting surface thereof.

"I am aware that so-called 'marbleized' paper, having a mottled appearance of sharp definition, with the hard, cold look of marble, have heretofore been produced, and have been used mainly or entirely for wrapping paper; but such papers, because of their unattractive appearance, and also because of their stiffness and other undesirable physical characteristics, are unsuitable for wall papers.

"I have found that the surface of the paper base may be roughened or broken up to give visionary depth to the cloud effect, producing the above-mentioned soft, artistic appearance, by incorporating with the paper stock an appropriate proportion of wood flour or the like, which is preferably added to the stock immediately before the formation of the paper, so that the particles of the wood flour will partially or wholly retain their contrasting color with respect to the tinted body of the paper base, or the desired surface effect may be attained by treating the surface of the paper base after formation, as by flowing the wood flour thereon. In either case the blending stock is subsequently flowed onto the broken-up surface; the paper so produced having a cloud effect of visionary depth, pleasing to the eye, in that it is soft and impressionistic as a whole, rather than glaring and intensively detailed.

"The paper base may be formed of almost any grade of paper stock, according to any suitable method of making paper, and may be of any color desired to form a suitable background for the blending stock forming the cloud effect thereon. Preferably the wood flour is mixed with the paper stock, so that the paper base is formed directly with the roughened or broken-up surface, and is better. adapted for hanging, and the blending stock of thin consistency to form the cloud effect is flowed onto the base so formed. After water is extracted from the paper, it is pressed and dried in the usual manner of making ordinary wall paper."

The claims are:

(1) The method of making wall paper with a cloud effect of visionary depth, which consists in forming a base of paper stock combined with wood flour to break up the light-reflecting surface of the paper, and flowing a blending stock on the surface thereof.

(2) A wall paper, having a base with a light-reflecting surface broken up by wood flour, and a blending stock forming a cloud effect thereon.

(3) A wall paper having a base of paper stock mixed with a material breaking up the light-reflecting surface thereof, and also having a blending stock forming a cloud effect on the top surface of the base. •

Notwithstanding the rather large number of exhibits introduced by the parties, the cases are quite free from serious controversy in the testimony, Indeed, I believe the question respecting the dominant patent must be resolved upon the following practically undisputed considerations:

First. That in the wall paper industry or art, in the past 15 years, there have been certain staples known as "ingrains," "oatmeal" pulps, "oatmeal" duplexes, and "harmonellas" (plaintiff's product); plaintiff claiming that, since the introduction of its manufacture and sale under the patent, it has become staple. These various types

are exemplified in the exhibits in the case. The parties practically assume that the "ingrain" and "oatmeal" papers are well known, and their differences are readily apprehendable to sight or other method of inspection. It is conceded that the so-called "ingrain" paper, very popular for many years, has latterly been superseded by the "oatmeal" paper, and the latter, so the proofs tend to show, has been supplanted to some extent by plaintiff's "harmonella." But it is a fact beyond controversy that for 14 years past—10 years before the advent of Warren's patent—the "oatmeal" papers, their characteristics, method of manufacture, and their distinctiveness, upon comparison with "ingrain" or other hitherto known wall papers, were as well known as is any fact in the wall paper making art or trade.

Second. That the art of introducing variegated colors into papers as a part of, or in connection with, their initial machine manufacture, is old; that for many years machine paper making has included the introduction of "marbling," color variegating, blending, clouding, mottling, and the like, and that the method or methods pursued have been open, and therefore well known, to workers in the general papermaking art, and that likewise such methods have been pursued in the making of wall papers; that, with some variation in mechanism and the prosecution of methods, two distinct courses seem to be recognized, namely, the introduction of a blending stock into the paper stock proper, at or about the time when the latter enters the machine, or shortly before the stock proper begins to assume the form of a sheet; and, secondly, the introduction of the blending stock as a facing or covering to the paper stock or base proper, as the latter is progressing through the paper-making machine.

Third. That the plaintiff's patent concededly covers the well-known method of introducing a blend or a blending stock to and upon what is known as "oatmeal" paper in substantially the same manner and by following substantially the steps pursued in the introduction of a blend or mottling material to other kinds of paper.

Counsel for the plaintiff frankly admitted that the question in the case may be narrowed to this: Whether, when Warren applied the known methods of blending paper to the so-called "oatmeal" paper, and found that it resulted in what is now characterized as "cloud effect of visionary depth," he invented anything. The facts above narrated are of importance in dealing with the language of the patent and its claims, especially in the light of the disclosure of the file wrapper. It is probably true that prior to Warren no one had taken "oatmeal" paper and introduced a blend, but in the progress of the patent in suit through the Patent Office it is rather surprising that no reference was made to the then commonplace status of "oatmeal" paper in the wall paper art, nor to test out, in its simple form, the question now presented. When the file wrapper is read with the specifications and claims, it is hard to escape the conviction that the Patent Office entertained and allowed the application upon the hypothesis that after all Warren did something novel in the way of preparing a blending stock, or preparing a new kind of paper base; in other words, the matter was not allowed to proceed through the Patent Office upon the

rather bald concession now made that, for example, the only claimed difference between Exhibits 6 and 8 rests in the fact that the latter is the well-known "oatmeal" paper, whereas the former is not "oatmeal" paper.

I am assuming, of course, that in making any blended paper, judgment, skill, and artistic sense plays some part in manufacture and in the production of satisfactory results. But when the patentee claimed a "discovery that a wall paper having a soft, pleasing appearance, together with a texture and body making it well suited * * * as a wall paper, may be produced (1) by flowing a thin cloudlike coating of a blending paper stock; (2) onto a paper base the surface of which has been broken up or roughened visually by incorporating with the said surface small particles as of wood flour of a color contrasting with the base and which interrupt the otherwise smooth light-reflecting surface;" and further, that he has "found" that "the surface of the paper base may be roughened or broken up to give visionary depth to the cloud effect," and that "the paper base may be formed of almost any grade of paper stock according to any suitable method of making paper," and that "preferably the wood flour is mixed with the paper stock, so that the paper base is formed directly with the roughened or broken up surface and is better adapted for hanging," and "the blending stock of thin consistency to form the cloud effect is flowed onto the base so formed"—when this language is found in the specifications—it is impossible to escape the conviction that there was no strenuous effort then to avow the facts now freely admitted, viz. that the so-called base is none other than the well-known "oatmeal" paper; that the process is the known process of "blending" or "clouding" paper by using known "stocks" as a step in processes before final completion of the manufacture of the paper.

Thus Warren originally presented to the Patent Office six claims, one of them reading:

"2. The method of making wall paper with a cloud effect of visionary depth, which consists in forming a base of paper stock and wood flour and flowing a blending stock on the surface thereof."

The Examiner, in rejecting this and two other quite similar claims, observed that:

"The process of making paper containing wood flour as an ingredient is disclosed in the patents to Marshall, 70,872, November 12, 1867," and "the addition of a very diluted pulp to any paper in order to form a mottled or marbled surface is common practice, and is disclosed in the following patents: Waite et al., 1,017,931, February 20, 1912; British patent to Imray, 6,847 of 1904, and to Anders, 8,390 of 1902."

Thereupon, for example, the applicant amended claim 2, above quoted, by striking out the word "and" after "paper stock," and inserted the words "combined with" before "wood flour," and added further "to break up the light-reflecting surface on the paper," and, in remarks supporting the request for a reconsideration, said (Italics supplied):

"The *essential object* of the present invention is to obtain *wall paper* having a *cloud effect of visionary depth*, and this is obtained by forming a base of

paper stock and a material which is not only merely capable of breaking up the reflection of light, but which *actually* does break up the light-reflecting surface, and then flowing a blending stock on to such surface. There are two co-ordinate steps or features involved in the invention both of which are *equally essential.* The base stock must have its surface roughened or interrupted by the admixture with the stock, in some way, of a material which actually breaks up the otherwise smooth light-reflecting surface, and a blending stock must be applied on the thus treated surface of the base. The mere incorporation of a substance such as wood flour with the paper stock will not alone produce the required result, nor will the mere flowing of a blending stock over *ordinary paper stock* produce the result desired. The two effects must be combined together."

As observed, these remarks, following the language of the specifications and the claims, necessarily give the impression that the elements or the steps, at least one of them, was a discovery by the applicant; that is to say, the impression is rather plainly given that the applicant was dealing with a base which, being treated as he suggests, developed the peculiar quality, by reason of the introduction of a "material" which is not only capable of "breaking up the reflection of light, but which actually does break up the light-reflecting surface," and later suggests that the mere incorporation of wood flour alone will not produce the result nor will the flowing of a blending stock over *ordinary* paper stock produce the result desired. The importance of this rests in the fact that after all the applicant was describing common "oatmeal" paper as a base, and therefore he was truthful when he said, in substance, though not in words, that "oatmeal" paper in and of itself does not exhibit blend or mottling, and he was equally truthful when he said that blending *ordinary* paper stock will not produce the same result as blending "oatmeal" paper; that is to say, if it be once conceded that the roughened surface and the effect of the roughening particles in "oatmeal" paper, unblended, is to break up the otherwise plain light-reflecting surface, then it may be self-evident that such roughening particles may have a like effect in blends. In other words, when objection was made because the element, a "base of paper stock and wood flour," was old under Marshall, the notion of "breaking" the "light-reflecting surface" was introduced as a matter of *words*, the applicant was still dealing, in truth, with "oatmeal" paper, well known.

And thereupon the applicant, still keeping away from an avowal of the fact last noted, now conceded, deals thus in the Patent Office with the Marshall patent, issued in 1867:

"All that Marshall shows is that fine sawdust or wood flour has been used as a chief ingredient in paper pulp. The purpose of its use is not stated and furthermore seems to be immaterial. It is conceivable that the flour or sawdust might be incorporated into pulp to effect various results; for instance, to give the pulp a greater body; e. g., to act as a filler, and it is equally conceivable that the flour might have no roughened action whatever. In brief, Marshall does not suggest in any way the idea of breaking up the otherwise smooth light-reflecting surface of paper stock by incorporating wood flour with it. It certainly does not suggest the use of wood flour for the purpose just stated in combination with a top coating of blending stock."

Dealing with other patents relating to blending processes, the applicant proceeds:

"Conversely, Waite, Anders, and Imray, merely show that the addition of a colored pulp to a different colored pulp base is known. If the steps shown in these patents were followed, the resultant paper would possess the smooth light-reflecting surface which it is the very object of the present invention to overcome, these patents merely disclose, in effect, the second step or feature of the present invention. They do not suggest the combination of the two coordinate steps or features, and for that reason they are no more pertinent, considered alone, than Marshall."

Now, as a result of this attitude, the three claims heretofore noted were allowed, and upon the facts now conceded such claims could and should be restated thus: (1) The method of making wall paper with a cloud effect of visionary depth, which consists in blending "oatmeal" paper. (2) "Oatmeal" wall paper, with a "cloud effect" blend. (3) "Oatmeal" paper with a "cloud effect" blend (on top surface of base). No suggestion is found in the evidence that "oatmeal" paper has not the characteristic of having its surface, which reflects the light, "broken," precisely as the patent claims. It is singular that in the art —and upon this particular application—the paper is not referred to categorically. In view of the disclosures in the evidence respecting "oatmeal" paper as being the real subject of blending, it is hard to escape the feeling that the applicant was fearful at all times that a familiar rule (American Grass Twine Co. v. Choat et al., 159 Fed. 140, 86 C. C. A. 330) be applied. In no other way can it be understood why trouble should have been taken to describe—as though it were new—the process for making "oatmeal" paper.

Therefore, upon the question whether Warren *invented* anything when he found that by applying well-known blending processes to the well-known "oatmeal" paper bases, he produced what he calls "cloud effects of visionary depth," we may at once ask whether he invented anything more or other than was invented by Koeck (American Grass Twine Co. v. Choate, supra) when he used Lowry's grass twine in practicing known processes for making rag rugs. If so, then every application of well-known blending or coloring processes to known materials may be claimed as inventive, if it is attractive to the eye, or susceptible of commercial exploitation; and, as suggested on argument, if Warren, instead of taking "oatmeal" paper (see Exhibit 8 in this case), and discovering that "cloud effect of visionary depth" resulted when he applied the well-known process (such as was used in making Exhibit 6), had not known of the results of applying the process upon a base such as was used in making Exhibit 6, but had first made Exhibit 8, and then reverted to the application of the process to the base found in Exhibit 6 and noted that it was more "marbleized," surely the latter would also have been a patentably novel discovery because many may prefer "marbleized" to "cloud" effects. And if, to-day, some one should discover that upon taking a base intermediate between Exhibit 6 and Exhibit 8, and, upon application of the same blending stock and process there produced a *"marbleized cloud effect of visionary depth,"* he, too, could claim a monopoly, and so on through the numberless possibilities of new applications of known methods.

But, whether the foregoing observations have any persuasive effect upon the fundamental question or not, there are other matters in evi-

dence whose consideration, so it seems to me, must readily resolve the issue against the plaintiff. Counsel for plaintiffs adverted to the great difficulty in attempting accurate description or definition of what Warren really discovered, but did not, in the light of the patent and the file wrapper, gainsay that the language so frequently used, "cloud effect of visionary depth," was intended to and does comprehend the definitive essentials of the invention. It may be noted that, once it is conceded to be difficult to define the invention, it is probably much more difficult to apply an attempted definition. Vagueness in meaning cannot bring certainty in application. Obviously, "cloud effects" were not new in the art. One of the workers had gone so far as to produce not merely "cloud," but "cirrus," "cloud effects." Now, it may be assumed that upon reproduction of a cloud, "depth" or "visionary depth" to the eye of an artist or a layman may be appreciable in varying degrees. But if, upon comparison of Exhibit 6 with Exhibit 8, the former be characterized as the witnesses attempted to characterize it, namely, as being "cold" and more "marbleized," whereas the latter has the "visionary depth," the question at once arises upon the testimony, What shall be concluded when Defendant's Exhibits 12 and 13, made in 1914 (Defendant's Exhibit, Harmon v. Griffin), are compared with Exhibit 8? Surely, a court or a jury, as a trier of facts, is not obliged to find differences—upon this matter of so-called "visionary depth"—which do not appear upon inspection. If it be that the words "cloud effect of visionary depth" convey no meaning understandable in a lawsuit, then the court ought to hold that they convey no meaning in the patent which workers in the art understand. The same query is inescapably presented upon comparison of many other of the exhibits of the prior art disclosing without question true cloud effects, though as is conceded with respect to these exhibits, the paper was used outside of the limited wall paper field. But the importance of the comparisons just noted rests in this: That if the conclusion is reached, as it is, that as, for example, in Exhibits 12 and 13 (Defendant's Exhibits, Harmon v. Griffin), true cloud effects—of visionary depth—were obtained in the general paper-making art, then no matter how great the popular favor with which plaintiff's "harmonellas" have been received, the product as embodying a cloud effect itself, and the favor with which it has been received, is not attributable to the circumstance that roughening particles on the surface of the paper bring about the peculiar result. This, as just noted, is most strikingly illustrated upon comparison of Exhibits 12 and 13 with Exhibit 8; for I have no hesitation in finding that, upon the plaintiff's somewhat indefinite claims as to the real meaning of "visionary depth," it is present in the one as much as in the other.

[2] The fact that plaintiff has had great success in marketing its "harmonella" paper, that it has in a considerable measure supplanted its former manufacture and sale of "ingrains" or "oatmeal" papers can hardly have any pertinency in this case, unless it can be said that the practically undisputed facts leave the matter of invention in doubt. I have sufficiently indicated that the question is considered entirely free from doubt; and it suffices to close this branch of the cases by

accepting as entirely applicable the many cases cited by the defendants wherein invention is denied upon the principle of American Grass Twine Co. v. Choate, supra.

[3] In the consideration of patent No. 1,344,603, two phases are urged as pertinent. The one deals with the valve or baffle control, and the other with the curved apron of the flow box. It is impossible, after reviewing patents such as Tittle, 816,402, Curtis, 912,292, MacDonough (German) 61,460, and the various patents dealing with the valve or other control means in the prior art, to ascribe invention to the mechanical differences claimed by Warren. Common practice not only recognized, but required, as near an approach to a tangential flow as was possible, and the introduction of greater or less angularity, or greater or less curvature, in the apron, was peculiarly within the province of skilled workers. So far as the baffle control is concerned, inherent necessity compelled and compels some sort of control over the mixture. The question whether such control shall be exerted through a succession of valves or baffles, or whether a baffle shall be adjustable —when some control is necessary—is in no event a problem appealing to genius. I am content to dispose of this part of the case upon the rather free concession that Warren made no change in apparatus which added substantially to apparatus quite old in the art.

[4-6] What has been said respecting the validity of the method patent, and the product resulting therefrom, is deemed to be of pertinency in the consideration of the design patent No. 51,152. What Warren obtained was not a patent on a "design" in a true sense. He declares that he had invented "a new original and ornamental design for wall paper," and the accompanying drawing, as well as sample, of his wall paper, are found with the patent. If in this case the plaintiff adhered to any claim that the drawing and sample wall paper forming a part of the patent constituted a new design, and that the defendant infringed it by making a like design, probably the issue could be resolved in favor of the defendant on noninfringement. But the plaintiff urges that the design covered by the grant is not merely the configuration or the pattern exemplified in the drawing or in the sample of wall paper, but it covers any wall paper having "a cloud effect of visionary depth" resultant upon practice of the process hereinbefore discussed. I do not believe that a design patent of such scope can be granted. Of course, if "cloud effects of visionary depth" may be the subject of a design patent, then "marble effect," the old-fashioned "graining" on wood work, the "slap dash" work of plasterers, the "stippling" in wall painting, the "mahogany effect" in staining woodwork, the "watered silk," and the infinite imitations or attempted reproductions in cloth fabrics and in the arts generally, may all be subject to like monopolistic appropriation through "design" patents, though in each case there be not only no claim that the design be a pattern for copying purposes but, on the contrary, there be the necessary concession that it is not capable of, and is not intended for, reproduction in a true sense. Herein, of course, is a marked difference from cases such as disclose a pattern or a set configuration intended to be worked into a carpet, to be reproduced in pottery, or chinaware, or casting.

The design patent to Warren, to be any good, must, of course, cover the whole range of wall papers which, being blended, exhibit the "cloud effect of visionary depth." Undoubtedly a design patent, if valid, must be susceptible of application within the art; and it seems anomalous to award a patent upon a design which in itself is incapable of reproduction. I am well satisfied that the design patent is void.

The defendant may take a decree dismissing the bill in each case.